UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* GREGORY M. GOODMAN, | ) ) ) | Civil Action No. |
| Plaintiff, | ) ) ) | RELATORS' COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §3729 *ET SEQ.* |
| vs. | ) ) | **FILED UNDER SEAL** |
| ARRIVA MEDICAL, LLC and ALERE, INC., | ) ) | **DO NOT PLACE ON PACER** |
| Defendants. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

## RELATOR'S COMPLAINT PURSUANT TO
## THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *ET SEQ.*

Relator Gregory M. Goodman (referred to herein as "Relator"), on behalf of the United States of America, brings this action against Arriva Medical, LLC and Alere, Inc. (collectively, "defendants") for violations of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, to recover all damages, civil penalties and other recoveries provided for under the FCA.

## I.      PARTIES

1.      Defendant Arriva Medical, LLC ("Arriva") is a Florida limited liability company with its headquarters in Coral Springs, Florida. Arriva was founded in 2009 and is a fast-growing mail order supplier of diabetic testing supplies, including glucose meters, test strips, lancets, lancet devices and control solution. As part of its mail order business, Arriva operates a call center in Antioch, Tennessee.

2.      Defendant Alere, Inc. ("Alere") is a publicly traded Delaware corporation headquartered at 51 Sawyer Road, Suite 200, Waltham, Massachusetts. Alere purchased Arriva in November 2012 for approximately $65 million.

3.      The United States of America (hereafter, "United States") is a plaintiff to this action. The United States brings this action on behalf of the U.S. Department of Health & Human Services ("HHS"), the Centers for Medicare & Medicaid Services ("CMS"), and other federally funded health care programs, including Medicare.

4.      Relator is a current employee of defendant Arriva and has standing to bring this action pursuant to 31 U.S.C. § 3730(b)(1). Relator's Complaint is not based on any other prior disclosures of the allegations or transactions discussed herein in a criminal, civil, or administrative hearing, lawsuit or investigation, or in a Government Accounting Office or Auditor General's report, hearing, audit or investigation, or from the news media.

- 1 -

## II.    SUMMARY OF THE ACTION

5.    Relator, on behalf of the United States, brings this case to challenge defendants' various, interrelated schemes to defraud the Medicare system.

6.    Specifically, defendants have defrauded and continue to defraud Medicare in defendants' role as a mail order supplier of diabetic testing supplies to Medicare beneficiaries.

7.    Under Medicare Part B, the payments defendants receive for providing diabetic supplies are divided into three elements: (1) the allowable cost that is paid by federally funded health care programs (including Medicare Part B); (2) a deductible that is paid by the beneficiary; and (3) a copayment that is paid by the beneficiary.  Under Medicare Part B, the deductible is approximately $147 per year, and the copayment cost division is 80-20—*i.e.*, Medicare Part B pays 80% and the beneficiary (or the beneficiary's supplemental insurer) pays the remaining 20%.  This copayment division applies to all diabetes supplies, including glucose meters and test strips.

8.    As of July 1, 2013, Medicare Part B significantly altered its policies for compensating diabetic testing suppliers.  Specifically, pursuant to the Medicare Modernization Act of 2003 ("MMA"), Medicare Part B implemented a competitive bidding system for mail order suppliers of diabetic testing equipment.  Under this system, Medicare will only compensate those suppliers who have been awarded contracts pursuant to the competitive bidding program.

9.    In the months leading up to this change, the business landscape for mail order diabetic testing supplies was in upheaval, with successful bidders rushing to acquire the assets and customer lists of unsuccessful bidders who would not be able to bill Medicare for diabetic testing supplies after July 1, 2013.

10.    Arriva was one such successful bidder, and it spent much of 2012 acquiring other diabetic testing suppliers that were preparing to exit the market.  Specifically, Arriva purchased Direct Diabetic Source, Inc., AmMed Direct LLC, and the diabetes home supply businesses of

NationsHealth, Inc. and Liberty Medical Supply, Inc. ("Liberty Medical"). During the same period, Arriva was itself acquired by defendant Alere.

11.     Both during and after this period of transition, defendants have engaged in six distinct but related schemes to defraud the federal government.

12.     First, defendants have fraudulently billed Medicare for thousands of glucose meters that were not medically necessary, and that defendants knew were not medically necessary.

13.     Second, defendants have offered kickbacks to their customers—in the form of free, "upgraded" meters and forgiving copayments—to induce beneficiaries to obtain their diabetes testing supplies from defendants and to further induce beneficiaries to order unnecessary products and services covered and partially paid for by Medicare.

14.     Third, defendants have offered kickbacks, in the form of forgiving copayments, to secondary insurance providers Express Scripts, Inc. ("ESI") and United Healthcare ("United") to induce those insurers to refer their Medicare-covered, diabetic patients to defendants to obtain diabetic testing supplies.

15.     Fourth, defendants have illegally marketed heating pads, back braces, and impotence therapy devices to new patients during calls to place orders for diabetic testing supplies, and have billed Medicare for these illegally marketed items.

16.     Fifth, defendants have illegally billed Medicare for diabetic supplies without having the necessary prescriptions on file from beneficiaries' physicians.

17.     Sixth, following the change in the law on July 1, 2013, defendants illegally induced Medicare beneficiaries to switch from one brand of diabetic testing supplies to another.

18.     Underlying these fraudulent schemes was defendants' general desire to convert as many of its customers as possible to two specific brands of diabetic testing supplies—Prodigy AutoCode and TRUEresult. Defendants had and have contracts in place with the makers of these

two brands that make them more lucrative for defendants to supply than other brands of testing supplies.

19.     Accordingly, in order to increase their own profits, defendants have submitted false claims for payment to the United States, offered unlawful kickbacks to secondary insurers and to Medicare beneficiaries, and have illegally reduced the choices available to beneficiaries and their physicians for diabetic testing supplies.

## III.    JURISDICTION AND VENUE

20.     Jurisdiction is founded upon the FCA, 31 U.S.C. § 3729 *et seq*., specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331 and 1345.

21.     Venue in the Middle District of Tennessee is appropriate under 31 U.S.C. § 3732(a) in that, at all times material to this civil action, one or more of the defendants transacted business in the Middle District of Tennessee, or submitted or caused the submission of false claims in the Middle District of Tennessee.

## IV.    THE MEDICARE PART B PROGRAM

22.     Title XVIII of the Social Security Act prescribes coverage requirements under Part B of the Medicare program.  Medicare Part B covers services and items including durable medical equipment ("DME").  DME is "equipment furnished by a supplier . . . that—(1) [c]an withstand repeated use; (2) [i]s primarily and customarily used to serve a medical purpose; (3) [g]enerally is not useful to an individual in the absence of an illness or injury; and (4) [i]s appropriate for use in the home." 42 C.F.R. § 414.202.

23.     Medicare Part B covers blood sugar self-testing equipment, including blood sugar monitors,[1] blood sugar testing strips, lancet devices, lancets, and glucose control solutions, if the patient meets these requirements: (1) the patient is under a physician's care for diabetes; (2) the

---

[1]    The devices diabetic patients use to test their blood sugar are known as both "monitors" and "meters."  The two terms are used interchangeably.

accessories and supplies have been ordered by the patient's treating physician; (3) the patient (or patient's caregiver) has been trained to use the required equipment in an appropriate manner; and (4) the equipment is designed for home rather than clinical use.

24.     In general, Medicare will not pay for any expense that is "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. § 1395y(a)(1)(A).

25.     Medicare Part B also limits how often Medicare will pay for DME such as diabetic testing supplies.  For glucose monitors, Medicare will only pay for a replacement if the device has been in continuous use by the beneficiary for the product's "reasonable useful lifetime," or if the item has been lost, stolen or irreparably damaged.  42 C.F.R. § 414.210(f).  Moreover, the reasonable useful lifetime of glucose monitors is recognized by Medicare to be at least five years.  42 C.F.R. § 414.210(f)(1).

26.     With respect to testing strips, Medicare Part B covers up to 100 per month for beneficiaries who are insulin dependent and up to 100 per three months for beneficiaries who are not insulin dependent.  Suppliers are not permitted to bill for more than three months of supplies at a time.

27.     As an additional requirement for diabetic testing strips, the *Medicare Program Integrity Manual* requires suppliers of DME—including diabetes testing supplies—to have a detailed written order from a physician prior to billing Medicare.  CMS, MEDICARE PROGRAM INTEGRITY MANUAL,    ch.    5.2.3,    *available    at*    http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS019033.html.

28.     If a supplier does not have an order "that has been both signed and dated by the treating physician before billing the Medicare program, the item will be denied as not reasonable and necessary."  *Id.*

- 5 -

29.     Any time that a beneficiary switches from one supplier to another, that supplier is required to obtain a new order prior to billing Medicare.  *Id.*, ch.5.2.4.

30.     The Medicare Part B diabetic supplies landscape has recently undergone major reform.  Section 302 of the MMA established requirements for a new competitive bidding program for certain durable medical equipment, prosthetics, orthotics and supplies ("DMEPOS").  Under the competitive bidding program, DMEPOS suppliers submit competitive bids to furnish diabetic supplies and the CMS awards contracts to enough suppliers to meet beneficiary demand for the bid items.  The bids represent the amount a DMEPOS supplier is willing to accept to provide specified items or services to a Medicare beneficiary.  All DMEPOS suppliers must comply with Medicare enrollment rules, be licensed and accredited, and meet certain financial standards.

31.     On July 1, 2013, this program was expanded to include a national mail order program for diabetic supplies.  As of that date, beneficiaries looking to obtain diabetes testing supplies through the mail were required to get those supplies from an approved contract supplier.  At the same time, contract suppliers—*i.e.*, those mail order diabetic suppliers that were awarded contracts by the CMS—were required to furnish mail order diabetic testing supplies to Medicare beneficiaries in all parts of the United States, including the 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, Guam, and American Samoa.  The CMS opened the 60-day bid window for the national mail order competition on January 30, 2012 and began the contracting process in late 2012.

32.     In order to obtain a nationwide diabetic supplier contract under this bidding process, suppliers were required to demonstrate that their bid covered "the furnishing of a sufficient number of different types of diabetic testing strip products that, in the aggregate, and taking into account volume for the different products, includes at least 50 percent of all the different types of products on the market." 42 C.F.R. § 414.411(a).

33.    Additionally, under the terms of their contracts with the CMS, all nationwide diabetic suppliers had to agree to "furnish the brand of diabetic testing supplies that work with the home blood glucose monitor selected by the beneficiary." 42 C.F.R. § 414.422(e)(3). The contracts further prohibited suppliers from "influencing or incentivizing the beneficiary by persuading, pressuring, or advising them to switch from their current brand or for new beneficiaries from their preferred brand of glucose monitor and testing supplies." *Id.*

## V.    APPLICABLE LAW

### A.    THE FALSE CLAIMS ACT

34.    The FCA, 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

35.    The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

36.    The term "claim" means

any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

37. The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

## B. THE FEDERAL ANTI-KICKBACK STATUTE

38. The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that remuneration provided to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population. To protect the integrity of the Medicare and Medicaid programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, § 242(b) and (c); 42 U.S.C. § 1320a-7b; Medicare-Medicaid Anti-fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

39. The AKS makes it a felony for any person or entity to offer or pay remuneration, in cash or in kind, directly or indirectly, to induce a person:

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(2). Violation of the statute also can subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7a(a)(7).

40.     The AKS was recently amended to expressly state what many courts had already held, namely, that a violation of the AKS constitutes a "false or fraudulent" claim under the FCA. 42 U.S.C. §1320a-7b(g).

41.     Regulatory authorities have long recognized that the diabetic supplies industry is susceptible to unlawful kickback schemes.  In June 2000, the Office of the Inspector General ("OIG") published a report entitled, *Blood Glucose Test Strips: Marketing to Medicare Beneficiaries.*  In that report, the OIG reemphasized its concern with routine waiver of copayments and deductibles, stating:

> Medicare beneficiaries who utilize medical supplies on a repeated basis, such as blood glucose test strips, may be strongly influenced by marketing practices. Manufacturers' rebates, special dealer sales, coupons, discounts, and similar financial inducements are all designed to sway consumer product choice.  Entities interested in reaching diabetics who use testing supplies resort to a variety of media to promote their products, including radio, television, specialized periodicals, and newspapers.
>
>                  *          *          *
>
> In addition, 42.U.S.C. 1320a-7a(a) (5) prohibits a person from offering or transferring remuneration to a beneficiary that such person knows or should know is likely to influence the beneficiary to order items or services from a particular provider or supplier for which payment may be made under a Federal health care program. "Remuneration" is defined as including a waiver of coinsurance and deductible amounts, with exceptions for certain financial hardship waivers, which are not prohibited.

OIG Report, *Blood Glucose Test Strips: Marketing to Medicare Beneficiaries*, OEI-03-98-00231 (June 2000).

42.     In August 2002, the OIG issued a Special Advisory Bulletin entitled, "Offering Gifts and Other Inducements to Beneficiaries," which stated:

> Under section 1128A(a)(5) of the Social Security Act (the Act), enacted as part of Health Insurance Portability and Accountability Act of 1996 (HIPAA), a person who offers or transfers to a Medicare or Medicaid beneficiary any remuneration that the person knows or should know is likely to influence the beneficiary's selection of a particular provider, practitioner, or supplier of Medicare or Medicaid payable items or services may be liable for civil money penalties (CMPs) of up to $10,000 for each wrongful act.  For purposes of section 1128A(a)(5) of the Act, the statute defines "remuneration" to include, without limitation, waivers

of copayments and deductible amounts (or any part thereof) and transfers of items or services for free or for other than fair market value. (*See* section 1128A(i)(6) of the Act; 42 CFR 1003.101.)

OIG Special Advisory Bulletin, *Offering Gifts and Other Inducements to Beneficiaries* (Aug. 2002).

### C. PROHIBITIONS AGAINST UNSOLICITED MARKETING TO MEDICARE BENEFICIARIES

43.     Federal law places strict limits on a Medicare supplier's ability to solicit business from a beneficiary.

44.     Specifically, under 42 U.S.C. §1395m(a)(17), suppliers are typically prohibited from making unsolicited telephone calls to Medicare beneficiaries regarding the furnishing of a covered item to that individual.

45.     There are only three circumstances in which a supplier is permitted to contact a beneficiary by telephone regarding the furnishing of an item covered by Medicare: (i) the individual has given written permission for the contact; (ii) the supplier has furnished a covered item to the individual in the past and is contacting the individual only with respect to that covered item; or (iii) for contacts regarding the furnishing of a covered item other than the covered item the supplier has previously furnished to that individual, the supplier has furnished at least 1 covered item to the individual during the previous 15 months. 42 U.S.C. §1395m(a)(17)(A).

46.     The CMS has further clarified that even for a solicited phone contact (*i.e.*, one specifically requested or pre-approved by the beneficiary) the supplier may not attempt to solicit orders for additional covered items from new patients. *See* CMS, *Telemarketing Frequently Asked Questions*, Answer 3, *available at* http://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/MedicareProviderSupEnroll/Downloads/DMEPOSTelemarketingFAQs.pdf ("If this is the first contact ever made by the supplier to the beneficiary, then the supplier is prohibited from attempting to solicit the purchase of additional covered items since the supplier only had permission to contact the beneficiary regarding the particular covered item prescribed by the physician.").

47.     Under 42 U.S.C. §1395m(a)(17)(B), "[i]f a supplier knowingly contacts an individual in violation of subparagraph (A), no payment may be made under this part for any item subsequently furnished to the individual by the supplier."

D.     CHANGES TO MEDICARE PART B EFFECTIVE JULY 1, 2013

48.     Under Medicare's competitive bidding program, which went into effect for mail order diabetic testing supplies on July 1, 2013, beneficiaries are required to obtain all items covered by a contract bidding program from an accepted contract supplier.  42 C.F.R. § 414.408(e).

49.     To obtain a contract to supply diabetic testing strips, the CMS requires bidders to demonstrate that the submitted bid "covers the furnishing of a sufficient number of different types of diabetic testing strip products that, in the aggregate, and taking into account volume for the different products, includes at least 50 percent of all the different types of products on the market." 42 C.F.R. § 414.411(a).

50.     As a contract supplier of mail order diabetic testing supplies, a supplier is obligated to "furnish the brand of diabetic testing supplies that work with the home blood glucose monitor selected by the beneficiary." 42 C.F.R. § 414.422(e)(3).  Furthermore, the law explicitly prohibits the contract supplier from "influencing or incentivizing the beneficiary by persuading, pressuring, or advising them to switch from their current brand or for new beneficiaries from their preferred brand of glucose monitor and testing supplies."  *Id.*  Suppliers may not speak to beneficiaries about alternative brands "***unless the beneficiary requests such information***."  *Id.* (emphasis added).

51.     If a contract supplier violates the terms of its agreement with the CMS, the CMS is expressly authorized, *inter alia*, to suspend the contract, terminate the contract, and "[a]vail itself of all other remedies allowed by law."  42 C.F.R. § 414.422(g).

- 11 -

## VI.  STATEMENT OF FACTS

### A.  OVERVIEW OF DEFENDANTS' SCHEMES TO DEFRAUD

52.  Relator Gregory Goodman is a current sales representative at Arriva, a position he has held since the beginning of February 2013.

53.  Relator's responsibilities include contacting customers via telephone when customers are in need of new diabetic supplies, and re-ordering such supplies for customers.

54.  During the same period that Relator has worked for defendants, Arriva has been heavily focused on "converting" beneficiaries of Liberty Medical into Arriva beneficiaries.

55.  Arriva had purchased the diabetes mail order supply business of Liberty Medical in late 2012, including a beneficiary list that contained several hundred thousand names.[2]

56.  At the time of this transition, the CMS had already selected Arriva as a winning bidder in its competitive bid program for national mail order suppliers of diabetes testing supplies.

57.  As part of that bid, Arriva agreed that it would supply the following brands of diabetic testing supplies to beneficiaries:[3]

| Abbott | Freesyle Lite, Freestyle or Freestyle Flash or Freestyle Freedom, Medisense Optium |
| Bayer | Ascensia Breeze 2 or Auto Disc, Ascensia Contour, Asencsia Contour TS, Ascensia Elite |
| Diagnostic Devices Inc. | Prodigy Advance, Prodigy AutoCode |
| HMD Biomedical, LLC (d/b/a Infopia USA) | Eclipse, Element, Embrace |

---

[2]  The purchase of Liberty Medical ended up being a contentious and drawn out affair – one that was not definitively resolved until April 2013, when a Delaware bankruptcy judge ruled that Liberty Medical, which had declared bankruptcy in February, could not disclaim its agreement as an unenforceable executory contract.

[3]  *See* Medicare.gov, Arriva Medical, LLC, Product Details, Mail-Order Diabetic Supplies, http://www.medicare.gov/supplierdirectory/profile.html?profTab=0&loc=ZIP|37067|35.9046545|86.7718017|10&supId=6175500001&catlist=904&viewmap=0&name=ARRIVA%20MEDICAL%2C%20LLC%20%2F%20ARRIVA%20MEDICAL%20LLC&rsort=15|ASC&rpage=1|10&rindex=0 (last visited July 17, 2013).

| Invacare | Prestige Smart System, Truetrack |
| Nipro (previously was Home Diagnostics Inc.) | True Balance, True Read |
| Prodigy Diabetes Care | Voice Prodigy |
| Simple Diagnostics | Clever Choice or Clever Check, Clever Choice Voice or Clever Check Voice |

58. At no point during Relator's time with defendants—either before or after July 1, 2013—did Arriva actually service all of the brands they had represented to Medicare that they would service. Instead, defendants attempted to switch all of their customers over to two preferred brands of testing meters—the Prodigy AutoCode and TRUEresult—along with the accompanying testing strips for those products.[4]

59. Upon information and belief, selling Prodigy AutoCode and TRUEresult products was particularly profitable for defendants, as defendants had contracts with the makers of Prodigy AutoCode and TRUEresult that rewarded defendants for selling high volumes of those products.

60. Beneficiaries who had previously ordered their diabetic testing supplies from Liberty Medical used various different brands, not just the two brands Arriva wanted to order for them. In fact, Relator estimates that out of the thousands of Liberty Medical patients he spoke to during his time at Arriva, fewer than 20 used TRUEresult or Prodigy AutoCode meters.

61. Moreover, many of Arriva's own clients had, up until that point, used glucose monitors other than the two brands Arriva wished to service.

62. Defendants knew that after July 1, 2013, any attempt to induce or pressure beneficiaries into switching glucose monitors would be specifically prohibited under the federal regulations governing competitively bid contracts.

---

[4] Diabetes testing strips are brand specific. Accordingly, strips designed for one brand of glucose monitor will typically not work with any other brands of glucose monitors.

63.     Defendants therefore engaged in a huge "conversion" program in the months leading up to July 1, 2013, in an attempt to switch as many beneficiaries as possible over to Arriva's preferred brands of testing equipment.

64.     To help facilitate this conversion, defendants employed a team of sales associates out of a call center in Antioch, Tennessee. During the time Relator has worked for defendants, defendants divided employees at this facility into three basic teams. The Reorder Team was responsible for calling existing customers of Arriva to convince those customers to reorder their diabetic testing supplies from defendants. The Conversion Team was responsible for calling and taking calls from customers of Liberty Medical and converting those individuals into Arriva customers. And the Customer Service Team took non-sales related calls from customers.

65.     During the period Relator has worked for defendants, the Conversion team was primarily engaged in converting over former customers of Liberty Medical. However, upon information and belief, defendants employed similar conversion campaigns when they acquired other mail order diabetes testing suppliers, which was prior to the point Relator was employed by defendants.

66.     As of late June 2013, the Reorder Team had approximately 40 full time employees, the Conversion Team had 30-40 full time employees and a comparable number of contract temporary employees, and the Customer Service Team had a dozen or more full time employees.

67.     Defendants also maintain a call center in Taguig City, Philippines and Port St. Lucie, Florida. Upon information and belief, these call centers have dealt only with the new patient intake, reorder, and customer service portions of defendants' business, and have not been involved in converting over customers of acquired entities.

68.     At no point did defendants instruct Relator or other sales representatives to check with beneficiaries about the age of their glucose meters before attempting to "upgrade" those

beneficiaries to a preferred brand. In fact, defendants' own records for many of these beneficiaries indicated that the beneficiaries had ordered glucose meters within the past five years.

69.     Instead, defendants consistently and repeatedly emphasized to sales representatives that they were to convert beneficiaries over to preferred brands of diabetic testing supplies in every possible circumstance.

70.     During and through this conversion process, in the period leading up to the July 1, 2013 implementation of defendants' competitively bid contract with the CMS, defendants engaged in five related but distinct schemes to defraud the United States.

71.     First, defendants engaged in a scheme to bill Medicare for new glucose monitors for thousands of Medicare Part B beneficiaries, despite the fact that defendants knew that such monitors were not medically necessary.

72.     Second, defendants engaged in a kickback scheme designed to induce and that did induce thousands of Medicare Part B beneficiaries to order their diabetic testing supplies from defendants and to order medically unnecessary supplies. These unlawful kickbacks included "free upgrades" to beneficiaries' meters—to one of defendants' two preferred brands—and the forgiveness of beneficiary copayments.

73.     Third, defendants engaged in a kickback scheme with Express Scripts ("ESI") and United Healthcare ("United") by which ESI and United agreed to refer their own beneficiaries—*i.e*, individuals covered by Medicare Part B with ESI and/or United as supplemental insurers—to Arriva for diabetic testing supplies. In exchange, defendants agreed not to pursue the 20% copayments from ESI, United, or from the individual beneficiaries insured by them.

74.     Fourth, defendants engaged in a scheme to "up-sell" patients—including those being converted over from Liberty Medical—by attempting to convince those beneficiaries to order

heating pads, back braces and/or impotence therapy devices in addition to diabetic testing supplies, in violation of the federal prohibition against unsolicited telephone contacts by suppliers.

75. Fifth, defendants engaged in a scheme to bill Medicare for diabetic supplies before obtaining the proper prescriptions from physicians.

76. After the July 1, 2013 implementation of defendants' competitively bid contract, defendants continued to engage in all five of the fraudulent schemes outlined above—despite minor changes in the way they marketed to beneficiaries.

77. Moreover, after the July 1, 2013 implementation of defendants' competitively bid contract, defendants continued their efforts to switch beneficiaries into defendants' preferred brands of testing supplies, in clear violation of Medicare's prohibition against persuading, pressuring or advising beneficiaries to change brands. Accordingly, after July 1, 2013, all claims for payment made by defendants upon Medicare that arose from such unlawful inducements were false and fraudulent.

78. By and through these schemes to defraud, defendants have submitted and continue to submit thousands of fraudulent claims for payment to the United States; have illegally reduced beneficiaries' choices for diabetic testing supplies; and have increased defendants' customer base through illegal kickbacks.

**B.** **DEFENDANTS' SWITCHING SCHEMES PRIOR TO JULY 1, 2013**

**1.** **Defendants' Attempt to Switch Their Own Customer Base to TRUEresult and Prodigy AutoCode Meters**

79. Relator began working for Arriva on February 4, 2013, as a reorder representative, out of defendants' Antioch, Tennessee, call center.

80. As a reorder representative, Relator's primary job responsibility was calling existing clients of Arriva—*i.e.*, individuals who had previously ordered diabetic testing supplies through Arriva—to convince those clients to reorder their diabetic testing supplies through the company.

81.     On average, Relator called approximately 200-250 people a day, and placed an average of approximately 60-80 reorders per day.

82.     Relator's managers specifically instructed him to switch every client he spoke to over to one of Arriva's two preferred meters—the Prodigy AutoCode or the TRUEresult.

83.     On February 15, 2013, Tricia Romero, the manager in charge of both the Antioch, Tennessee, and Port St. Lucie, Florida, call centers, sent an e-mail to reorder representatives stating that "[a]nyone who is due for a Reorder and they have a Clever Choice or a Breeze 2 meter – you will need to convert them to either a Prodigy or True Result meter and supplies." The e-mail further emphasized, "[t]here are not [sic] exceptions; you will have to convert and give these customers the benefits of our preferred meters: Prodigy and True Result."

84.     Although defendants marketed Prodigy AutoCode and TRUEresult as meter "upgrades," many beneficiaries were being switched into these preferred brands from brands with features that neither of the two "preferred" brands possessed. For example, many other brands featured "drum" designs that allowed the patient to preload a number of testing strips at once. Many patients, particularly older patients who had difficultly handling test strips each day, found this to be a very valuable feature. Neither the Prodigy AutoCode nor TRUEresult "upgrades" possessed this feature.

85.     On March 20, 2013, the Reorder Sales Team Lead, Rebecca Dunlap, sent an e-mail to reorder representatives, including Relator, emphasizing that "[w]e are only supporting the Prodigy and True Result for New starts and Prodigy, True Result and Element Plus for Reorders."

86.     Relator's managers further explained to him that, while Arriva carried Element Plus brand test strips, Reorder Representatives were only to supply such products if the beneficiary already possessed an Element Plus meter and absolutely refused to switch to one of the two preferred brands.

87.     On March 26, 2013, Marie Decembre, from Arriva's Coral Springs, Florida, corporate headquarters, sent an e-mail emphasizing that "[w]e are currently in the process of converting all patients to True Result and Prodigy Supplies."

88.     When making a phone call to an existing customer, Relator was required to pull up information about that customer on his computer, using defendants' database, called "FLASH."

89.     The database contained such information as the customer's contact information, insurance carrier(s), treating physician and specific diabetic prescriptions.

90.     The database also contained fields for the individual's "existing meter," "proposed meter" and "new meter."

91.     For each customer in the database, the "proposed meter" was pre-coded to either the Prodigy AutoCode or TRUEresult meter.

92.     Reorder Representatives, such as Relator, were told to convince the customer to switch from his or her current brand to whichever of the two preferred brands was pre-coded in the "proposed meter" field.

93.     Relator was never provided any information as to why a particular customer was "pre-coded" for one of the preferred meters and not the other, other than defendants' desire to maintain a 50/50 split between TRUEresult and Prodigy AutoCode orders.

94.     In conversations with superiors in person and by e-mail, Relator was informed that Arriva had financial arrangements in place with the manufacturers of TRUEresult and Prodigy AutoCode that strongly incentivized the company to both (a) market those two brands instead of other testing supply brands; and (b) maintain a rough balance between those two brands.

95.     Relator was able to check the billing and shipping information for these reorders though the FLASH system—specifically the transaction screen and order screen within a particular

patient's file—and Relator occasionally checked the status of re-orders he had completed to make sure there were no issues in getting them processed.

96.     Through these checks, Relator noticed that for these reorders, defendants typically did not bill either Medicare or the beneficiary for the cost of the new, "upgraded" meter.

97.     This knowing failure to bill for "upgraded" meters was part of a broader kickback scheme, designed to induce beneficiaries to order or reorder their diabetic testing supplies from defendants.[5]

### 2. Defendants' Attempt to Convert Liberty Medical Customers to TRUEresult and Prodigy AutoCode Meters After Defendants' Acquisition of Liberty Medical's Diabetes Mail Order Business

98.     On or about April 29, 2013, Relator was moved from the Reorder Team to the Conversion Team.

99.     Arriva had purchased Liberty Medical's mail order diabetes supply business in the second half of 2012.  However, that purchase was delayed due to Liberty Medical's attempt to repudiate the agreement after filing for bankruptcy in February 2013.

100.    Ultimately, the bankruptcy judge forced Liberty Medical to honor the agreement, and in late April 2013, Arriva gained access to Liberty Medical's list of diabetic supplies customers.

101.    Arriva sent mailers to each of those customers, announcing that "Liberty's Medicare fee-for-service diabetes business is now a part of Arriva Medical, America's Choice For Diabetic Supplies."

102.    This mailer also provided customers with an 800 number they could call for reorders, as well as a "Reorder Authorization Form."

103.    The primary job of conversion representatives such as Relator was to place and field calls from former clients of Liberty Medical; convince those clients to order their diabetic testing

---

[5]   This kickback scheme is described in greater detail *infra*.

supplies from Arriva; and to further convince them to switch over to one of the two preferred brands of glucose meters.

104. As a conversion representative, Relator typically handled more than 300 calls per day. The majority of these calls were incoming, though Relator sometimes placed outgoing calls as well.

105. Information on Liberty Medical's clients was input and reviewed in the same FLASH database that defendants maintained for their own existing clients.

106. As with defendants' existing clients, defendants pre-coded the "proposed meter" field for almost all Liberty Medical clients to either the Prodigy AutoCode or the TRUEresult meter. For a tiny number of Liberty Medical clients, the One Touch brand meter was pre-coded as the "proposed meter," but conversion representatives were still instructed to flip these individuals to Prodigy AutoCode or TRUEresult, if possible.

107. As with defendants' existing clients, defendants repeatedly instructed conversion representatives to convert Liberty Medical's clients to the pre-coded, preferred meters.

108. Defendants' goal in this conversion campaign was to sell a 50/50 mix of Prodigy AutoCode and TRUEresult meters.

109. On May 22, 2013, Tricia Romero, from Arriva's Coral Springs, Florida, corporate headquarters, sent an e-mail criticizing sales representatives for not selling enough of the TRUEresult meters. Specifically, she criticized the sales representatives for the fact that "[w]e are seeing 90% Prodigy meter sold and only 10% for the True Result and the owners are not please [sic] about this. We need to keep our 50% Prodigy and 50% True Result meter mix that IT purposely entered into the proposed meter fields." The e-mail went on to note that "I need everyone to adhere to this ASAP because we have contracts with these vendors along with product in the warehouse that we need to sell."

110. Conversion representatives were all provided with a document called the "Liberty Conversion CALL Script," that set forth what representatives were supposed to say to beneficiaries during sales calls. As part of that script, representatives were supposed to ask: "I see you are currently using the _____ meter. Is that correct?" For beneficiaries using a non-preferred brand, the sales representative was then supposed to say: "In that case, we would like to upgrade you to the latest _____ meter (see upgrade matrix)."

111. The call script also had specific instructions on how to handle objections from beneficiaries about switching their meters. For example, if the beneficiary were to ask "[i]s the meter free?," representatives were instructed to answer that "[t]he meter comes to you with a 'no cost guarantee.' If your insurance denies the claim for any reason, we will not send you a bill for the meter."

112. Defendants also distributed "Conversion Quality Guidelines for Liberty" to its conversion representatives, including Relator, which set forth the standards by which Arriva was judging their calls.

113. One category by which conversion representatives, including Relator, were judged was their ability to "[h]ighlight new meter and benefits." Under the quality guidelines, a passing—as opposed to failing—call was one that, *inter alia*:

(a) "Should verify/ask the current meter of the patient."

(b) "Should highlight the new meter and provide at least a couple of its features."

(c) "Should convert non-preferred meter and send the new meter, if patient refused, should compare patient's current meter with the preferred meter."

(d) "If patient still refused after responding to objections, should say, "Mr./Ms. (patient's last name), we are unable to provide the strips for your current meter at this time. Would it be okay if we check back with you in the future to see how you are doing?"

114.    By late June 2013, defendants were putting extra effort into converting as many beneficiaries as possible to one of their two preferred brands, as the July 1, 2013 deadline was rapidly approaching.

115.    During the month of June 2013, Arriva shipped a total of 172,946 orders for diabetic testing supplies.  Of this number, 104,329 were Liberty Medical conversions, 62,623 were reorders, and 5,994 were new starts.

116.    On June 24, 2013, Jessica Crowell, the Arriva Reorder Sales Manager, sent an e-mail to members of the Conversion Team specifically telling them to put in reorders—along with the conversions to new meters for Liberty Medical clients—for *any* client calling in, even if the data in the database showed that the client was not yet eligible to reorder testing supplies.

117.    Due to preexisting commitments, defendants did offer other brands to a very small number of clients in the months leading up to the July 1, 2013 implementation of defendants' competitively bid contract.

118.    On June 10, 2013, Arriva Reorder Sales Team Lead, Rebecca Dunlap, sent an e-mail listing the only seven patients "who can receive the Freestyle or One Touch supplies."  The e-mail went on to note: "We must try and convert these patients to the True Result or Prodigy.  **DO NOT OFFER** ONE TOUCH OR FREESTYLE.  We can only send those supplies if the patient absolutely refuses to change to one of our meters."

119.    Relator was able to check the billing and shipping information for Liberty Medical conversion orders though the FLASH system, just as he had been able to do when he was working on the Reorder Team earlier in 2013.

120.    Based on these checks, Relator determined that for the beneficiaries being converted over from Liberty Medical, defendants were billing Medicare for the new, medically unnecessary glucose monitors.

121. On June 26, 2013, Relator sent an e-mail to his Reorder Sales Team Lead, Rebecca Dunlap, asking her whether Arriva was billing Medicare or the individual beneficiary for a new meter in cases where the patient already had a meter that was less than five years old. Ms. Dunlap replied that "I'm pretty sure Medicare won't pay for the meter if they have already paid for it within the last 5 years. It would be an automatic denial. *We have to bill*, but once it's denied we incur the cost that we paid for the meter and write off the rest that Medicare would have paid." (emphasis added).

122. Contrary to Ms. Dunlap's statements, and upon information and belief, it is highly likely that Medicare did not catch all of defendants' thousands of false claims for payments and paid defendants for meters defendants knew to be medically unnecessary.

### C.   DEFENDANTS' KICKBACK SCHEME TO INDUCE BENEFICIARIES TO ORDER DIABETIC TESTING SUPPLIES FROM DEFENDANT ARRIVA

123. As noted in the previous section, defendants did not bill their own returning clients or Medicare for new, "upgraded" meters, even though defendants did bill Medicare for meter upgrades for new clients, including clients being converted from Liberty Medical.

124. At a more general level, defendants did not make serious attempts to collect copayments from any of their Medicare-covered clients.

125. For both reorder and conversion calls, Relator and other sales representatives were expressly instructed to answer any beneficiary questions regarding the cost of a new meter by telling the beneficiary that the meter comes with a "no cost guarantee." Representatives were further instructed to state that "[i]f your insurance denies the claim for any reason, we will not send you a bill for the meter." However, Relator knows, from first-hand experience, that many other sales representatives did not add this qualifying language, and simply told patients that the new meters came with a "no cost guarantee."

126.     Defendants knew that this "no cost guarantee" language would be confusing to many beneficiaries and create the impression that the meter would be completely free.

127.     Additionally, defendants confirmed to Relator that Arriva did not have a collections department at all, which meant that even when defendants did bill beneficiaries for copayments, they did not devote any meaningful resources to collecting them.

128.     On June 18, 2013, Relator sent an e-mail to Jessica Crowell, asking specifically about copayments for "upsell" items such as heating pads.  In response, Ms. Crowell wrote: "We send a statement, but do not have a collection department, so right now the answer is we just forgive it, but this is subject to change once we take the competitive bidding hit."

129.     On July 19, 2013, Relator sent an e-mail to Changlaire Colas, an Arriva reimbursement coordinator, regarding a patient who had been receiving phone calls regarding a bill he owed, that the patient believed to be for his diabetic testing supplies.  Relator asked for clarification from Ms. Colas, given that Relator had previously been told that Arriva had no collections department and did not attempt to collect from patients.  In response, Ms. Colas wrote: "You are right!  I don't believe it was Arriva calling him.  We do not call patients asking for money. Not within our billing department & it would be us calling if we did."

130.     As a follow up, Relator asked Ms. Colas in an e-mail: "So if someone owes something we basically send a bill and let it go at that right?"  Ms. Colas responded "Yes."

131.     Even for new starts and patients being converted from Liberty Medical, defendants regularly failed to bill the patient for new meters, even as defendants billed Medicare for those meters.

132.     In an e-mail exchange on July 3, 2013, Reorder Sales Team Lead Rebecca Dunlap explained to Relator that if a patient does not want a new meter "advise them that all new start orders

come with everything. Tell them we won't bill them for the meter . . . . Add a note to the cd/note reorder note not to bill for the meter."

133. By regularly failing to bill beneficiaries for copayments on medical supplies, and by systematically refusing to pursue collection on those bills defendants did send out, defendants unlawfully induced beneficiaries to order their diabetic testing supplies through Arriva; unlawfully induced beneficiaries to order unnecessary supplies; and, after July 1, 2013, unlawfully induced beneficiaries to switch over to defendants' preferred brands of testing supplies.

### D. DEFENDANTS' KICKBACK SCHEME WITH UNITED HEALTHCARE AND EXPRESS SCRIPTS

134. During the time that he worked for Arriva, Relator raised questions with his managers regarding what Reorder and Conversion Team members were supposed to say to beneficiaries concerning the out-of-pocket costs the beneficiary would have to pay for a new meter.

135. The written materials provided by defendants to sales representatives, including Relator, stated that the representatives should emphasize that the meters come with a "no cost guarantee," meaning that if the beneficiary's insurance denied the claim for any reason, Arriva would not bill the beneficiary.

136. Relator was familiar enough with Medicare Part B regulations to know that defendants were supposed to be billing beneficiaries (or their secondary insurers) for 20% of the cost of diabetic supplies, and was concerned that statements concerning a "no cost guarantee" might come across as misleading.

137. Relator also got the impression from his managers that beneficiaries with ESI or United as secondary insurers were treated somewhat differently than other customers.

138. During a conversation with Jessica Crowell in early June, Ms. Crowell informed Relator that Arriva had a deal in place with ESI and United whereby those two companies agreed to

refer patients to Arriva for their diabetic supplies and, in exchange, Arriva would bill them for less than the full value of the copayment.

139. In a follow-up e-mail to Jessica Crowell on June 18, 2013, Relator specifically asked "[i]f they [beneficiaries] have ESI and no second insurance it is my understanding that we will not pursue the remaining 20% which represents the co-pay. That is correct right?" In response, Ms. Crowell wrote that "ESI should be the secondary to MCR only. We are the preferred provider, which means that they refer their diabetes population to our company and we take a discounted reimbursement rate and we forgive any left over balance."

140. Similarly, in a June 27, 2013 e-mail exchange between Relator and Ms. Crowell, Ms. Crowell emphasized that beneficiaries with United or ESI as secondary insurance "will not be billed at all" for their diabetic supplies.

141. On July 11, 2013, Relator spoke in person to Changlaire Colas, who worked in Arriva's billing department in the Antioch, Tennessee, facility.

142. Relator asked Ms. Colas what defendants' policies were for collecting the 20% copayment from beneficiaries who had ESI as a secondary insurer.

143. Ms. Colas explained that such beneficiaries fell into three basic categories:

(a) First, if the beneficiary had Medicare as primary health insurance, ESI as secondary health insurance, and no additional insurance, Arriva would bill the 20% copayment to ESI. However, ESI would never pay it, and Arriva would not attempt to collect from either ESI or the beneficiary.

(b) Second, if the beneficiary had Medicare as primary health insurance, ESI as secondary health insurance, and United as tertiary health insurance, Arriva billed both ESI and United for the copayment. ESI never paid anything. United sometimes paid 5% or 10% or less, and

Arriva counted this as payment in full, and never attempted to collect the copayment directly from the beneficiary.

(c)     Third, if the beneficiary had Medicare as primary health insurance, ESI as secondary health insurance, and a provider other than United as tertiary health insurance, then Arriva billed the tertiary company for the copayment and expected to be paid in full.

144.    The reason for this distinction is that ESI and United both recognized Arriva as the preferred provider of diabetic supplies for individuals covered by their insurance plans.

145.    Accordingly, defendants engaged in a kickback scheme with ESI and United, whereby ESI and United referred their diabetic Medicare patients to Arriva in return for Arriva agreeing not to pursue the 20% copayment against ESI, United, or the individual beneficiaries.

E.    **DEFENDANTS' UNSOLICITED MARKETING AND UPSELLING SCHEME**

146.    Defendants instructed their sales associates to "up-sell" beneficiaries on every phone call the associates made.

147.    Specifically, the sales associates were instructed to market heating pads, back braces and impotence therapy devices to every patient they spoke to,[6] regardless of whether the patient had ever asked about these products.

148.    Defendants billed Medicare for these products at the following rates: back brace – $700; impotence therapy device (identified as an "E-Pump") – $700; heating pad – $100.

149.    Defendants provided sales representatives with general written scripts to use to market the benefits of each of these products.

150.    In the script for the back brace, sales representatives were instructed to ask "Is your Doctor currently treating you for: Back Pains or back problem [sic]?"  If the patient answered yes, the sales representative was then instructed to market the benefits of the back brace, state that "[t]his

---

[6]    For obvious reasons, sales representatives only marketed impotence therapy devices to male patients.

Case 3:13-cv-00760   Document 1   Filed 08/01/13   Page 28 of 48 PageID #: 28

item should be covered by Medicare at 80% once every 5 years," and conclude by asking "[w]ould you like me to send your Doctor a prescription for an [sic] Back brace?"

151. In the script for the heating pad, sales representatives were instructed to ask "Is your Doctor currently treating you for: Arthritis, Muscle Pain, joint pain, or back pain?" If the patient answered yes, the sales representative was then instructed to market the benefits of the heating pad, state that "[t]his item should be covered by Medicare at 80% once every 5 years," and conclude by asking "[w]ould you like me to send your Doctor a prescription for an [sic] Heating pad?"

152. In the script for the E-Pump, sales representatives were instructed to ask "Is your doctor currently treating you for erectile dysfunction or Impotence?" If the patient answered yes, the sales representative was then instructed to market the benefits of the E-Pump, state that "[t]his product should be covered by Medicare at 80% once every 5 years," and conclude by asking "[w]ould you like me to send your doctor a prescription for this product?"

153. On June 10, 2013, Relator received an e-mail from Robert Bushart of Arriva, containing a punch list of "items that must be covered with each and every new lead." One of the items specifically listed was "attempt to up sell for H-PAD or E-Pump."

154. Despite these instructions from Arriva, Relator usually did not attempt to upsell Liberty Medical conversion patients, given that his performance was measured in part by the speed of his calls, and upselling a patient could take significant additional time. However, Relator knows that many other conversion representatives did attempt to upsell Liberty Medical conversion patients.

155. Relator ran a report on July 17, 2013, which generated a list of back brace orders during the preceding two weeks. Of the 95 entries in the list, Relator was able to determine that at least 12 of those orders had been placed during the first phone call between Arriva and the patient.

156.     Relator also found a 2012 Powerpoint presentation from Arriva's Florida call center, which handled the majority of Arriva's new-patient intake.[7] This presentation listed monthly upsell goals for back braces, heating pads and impotence therapy devices (E-Pumps).  More specifically, the presentation stated that the intake team, which handled new patients, was supposed to upsell 900 back braces per month, 1,400 heating pads per month, and 175 E-Pumps per month.

157.     On July 12, 2013, Relator sent his manager, Jessica Crowell, an e-mail asking whether "[f]or Liberty conversions that we are doing their first order here at Arriva it is now ok to bring up and sell the upsells on the first call with these folks correct?"  Relator further asked "[a]nd for new intake calls is it ok on the first call to sell upsells as well?"  In a reply e-mail, Ms. Crowell answered yes to both questions.

158.     Accordingly, defendants violated the prohibition against unsolicited telephone contacts with every new patient defendants' sales representatives spoke to; and by marketing heating pads, back braces, and impotence therapy devices to patients who had only consented to talk to defendants regarding diabetic testing supplies.

159.     Moreover, any and all claims for payment on these heating pad, back brace, and impotence therapy device orders were false and fraudulent, as federal law prohibits payment for otherwise-covered orders for durable medical supplies when suppliers obtain those orders through illegal marketing to beneficiaries.

### F.     DEFENDANTS SHIPPED AND BILLED FOR DIABETIC TESTING SUPPLIES WITHOUT HAVING NEW WRITTEN ORDERS ON FILE

160.     During the period that Relator worked for Arriva, the overwhelming focus of the conversion campaign was to place as many orders as possible as quickly as possible, to win over

---

[7]     New patients, as compared to conversion patients, are individuals who had not previously ordered their diabetic testing supplies from either Arriva or one of the businesses Arriva acquired —*e.g.*, Liberty Medical.

patients of Liberty Medical—as well as the patients of other suppliers—before those patients had the chance to place orders with other mail order suppliers.

161.    When Arriva acquired Liberty Medical's mail order diabetic supply business, one of the assets it acquired was Liberty Medical's patient database, complete with records of each patient's diabetic prescription.

162.    Beginning in April 2013, Arriva used this information to send "fax blasts" to patients' physicians, asking them to submit new prescriptions for each patient from the Liberty Medical database.   Arriva sent these fax blasts without seeking any prior approval from the patients themselves.

163.    Obtaining new prescriptions was and remains important to Arriva, as Medicare rules require a new prescription before a new supplier can bill Medicare for a beneficiary's diabetic testing supplies.   CMS, MEDICARE PROGRAM INTEGRITY MANUAL, chs. 5.2.3, 5.2.4, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS019033.html.

164.    However, because of Arriva's concern that patients would look elsewhere for their supplies, sales representatives, including Relator, were instructed to go ahead and place orders for Liberty Medical conversion patients, even when no new prescription was on file.

165.    Relator's understanding was that Arriva would ship these supplies, but would not bill Medicare for them until a new physician order was filed.

166.    Occasionally, Relator's managers would run a report showing transactions for which Arriva had not yet obtained the necessary new order.   As a sales representative, Relator had access to these reports.

167.    The overwhelming majority of entries in these reports were from patients who had been converted over from AmMed Direct or NationsHealth—two diabetic supply businesses Arriva

had acquired in 2012—prior to Relator's employment with Arriva. Patients converted from Liberty Medical did not show up in the report. Relator believes that this was because the Liberty Medical orders were, as a rule, much more recent, so that the prescription-on-file issues had not yet been picked up on the system.

168. By looking at these reports, and checking the information against information in the FLASH database, Relator discovered a number of instances when Arriva billed Medicare for diabetic testing supplies without ever having a new prescription on file.[8]

169. From the limited review that he conducted, Relator estimated that as many as 10% of all orders shipped without a new prescription were ultimately being billed without a new prescription.

170. From Relator's experience on the Liberty Medical Conversion Team, and upon information and belief, these practices are continuing with respect to new patients converted over from Liberty Medical.

171. Accordingly, as a result of Arriva's haste to convert over as many patients as possible as quickly as possible, defendants have submitted and continue to submit false and fraudulent claims for payment for which defendants do not possess the necessary physician orders.

G. **DEFENDANTS CONTINUED TO VIOLATE THE LAW AFTER JULY 1, 2013**

172. On July 1, 2013, new laws governing mail order suppliers of diabetic testing supplies went into effect, as did defendant Arriva's competitively bid contract with the CMS.

173. Defendants continued their flipping, kickback, and unsolicited marketing schemes after the law changed on July 1, 2013, with only slight modifications.

174. During the final week in June 2013, defendants notified all sales representatives in the Antioch, Tennessee, call center that new call scripts were going into effect as of July 1, 2013.

---

[8] Several specific examples are described *infra*.

Case 3:13-cv-00760   Document 1   Filed 08/01/13   Page 32 of 48 PageID #: 32

defendants further stated that no sales representative would be permitted to make or field calls without reading these new scripts.

175.    At the same time that defendants provided these new scripts, they also provided sales representatives with a training module document entitled "Competitive Bidding/National Mail Order Program."

176.    A subsection of this training module document, entitled "Call Handling Changes / Script Updates," specifically noted that "[i]f the patient expresses an interest in alternate brands, the agent may discuss the benefits of the other products such as, Prodigy and TrueResult. However, the patient must first ask about alternative brands before they can be discussed."

177.    However, the actual scripts provided by defendants to the sales representatives clearly communicated that representatives were still expected to induce beneficiaries to switch over to the two preferred brands.

178.    For example, in the updated Liberty Conversion Outbound/Inbound Call Script provided to sales representatives on or around July 1, 2013, Step 8 calls for the sales representative to "qualify [the] meter."  Specifically, if the caller is Medicare eligible and has a meter that Arriva services, but not a preferred Prodigy AutoCode or TRUEresult meter, then the sales representative is supposed to state: "Our records show that you are currently using the _____ meter and we can get those supplies for this meter *unless you would like to hear about our other easy to use, pain-free meters and free home delivery.*" (emphasis added).

179.    In other words, sales representatives were specifically instructed to market the benefits of the preferred brands of meters to beneficiaries—easy to use, pain free, free home delivery—before agreeing to service the beneficiary's existing brand.

180.    In the separate Intake Inbound Call Script and Intake Outbound Call Script, defendants instructed sales representatives to ask Medicare eligible beneficiaries "Would you like to

hear more about our easy to use, pain-free meters and free home delivery?" *before* even verifying the

beneficiary's current brand of testing meter.

| **5a** | **If Medicare Eligible:** Ask, "Would you like to hear more about our easy to use, pain-free meters and free home delivery?" | |
|---|---|---|
| | **If Yes:** Proceed to #6 and discuss the Prodigy and/or TRUEresult meter features. | **If No:** Confirm meter currently used. |
| | | **If Arriva Medical services the patient's existing meter**, proceed to # 7 to complete the order. |
| | | **If we do not supply the patient's existing meter**, state, **"Arriva Medical does not supply the product you are using.  We do have other products if you would like to discuss them."** |
| | | -  **If No**, state, "I can refer you to the Medicare website www.medicare.gov.  If the patient would like, you may also supply the telephone for Medicare of 1-800-MEDICARE and/or recommend that patient check with a local retail pharmacy. |
| | | -  **If Yes**, Proceed to #6 and discuss the Prodigy and/or TRUEresult meter features. |

181.    As of July 1, 2013, defendants were only offering meters and testing supplies for four

different brands: Prodigy AutoCode, TRUEresult, OneTouch, and Embrace.

182.    The FLASH database, where sales representatives entered all of the information about

orders and reorders of diabetic testing supplies, contained a field for a beneficiary's "New Meter."

As of July 1, 2013, the New Meter field contained a dropdown list of six possible meters: Element

Plus, Embrace, Freestyle, OneTouch Ultra, Prodigy AutoCode and TRUEresult True Performance.

Sales representatives had no ability to enter in any other meters, and had no ability to process an

order for any meters not on this dropdown list.

183. Furthermore, though the dropdown list for new meters contained six brands of meters, Relator and other sales representatives were specifically instructed, in person and by e-mail, that they could not place orders for Element or Freestyle brand meters.

184. In contrast to this dropdown list, defendants had distributed a "meter matrix" to sales representatives at the beginning of July which listed 16 different brands that Arriva was servicing under its contract with the CMS.

185. Similarly, the training module distributed to sales representatives at the end of June and beginning of July stated that "[a] list of the meters serviced by Arriva Medical was provided to Medicare as a part of the bidding process and is listed on Medicare's website at www.medicare.gov." As of July 5, 2013, that list on Medicare.gov listed 19 models that Arriva claimed to service. *See* http://www.medicare.gov/supplierdirectory/manufacturer-list.html?loc=37067&providerID=6175500001&catg=904.

186. On Monday morning, July 1, 2013, Arriva employee Michelle Keith conducted a training session, in which she went over and explained the new call scripts and training module. In that meeting, Ms. Keith specifically told Relator and other sales representatives:

(a) sales representatives must send out meters with every order, regardless of whether the beneficiary requests one;

(b) even if the patient affirmatively states that he or she does not want a new meter, the sales representative should still send one unless the patient is irate about it; and

(c) sales representatives should specifically state to patients on every call that Arriva's preferred brands of meters are "pain free," regardless of whether the patient actually asks about alternative brands of meters, and despite the fact that meters are not, if fact, pain free.

187. The substance of this meeting was confirmed in an e-mail exchange between Relator and Ms. Keith.

188.     During the week of July 1, 2013, Relator recognized this discrepancy between the meters Arriva claimed to service and those it was actually willing to service.

189.     On July 2, 2013, Relator sent an e-mail to Jessica Crowell asking about this discrepancy and seeking clarification on when new meters would be added to the dropdown list in the FLASH database.  In response, Ms. Crowell explained that "[t]hey're not – we are no longer offering the additional meters."

190.     Similarly, in an e-mail exchange with Rebecca Dunlap, Relator asked: "We now sell prodigy autocode, true result and one touch ultra 2 and embrace meter and if they have the other brands from the same man'f we are to put them in the prodigy autocode meter and true result meter – correct?"  Ms. Dunlap confirmed by reply e-mail that Relator's understanding was correct.

191.     Cumulatively, Prodigy AutoCode, TRUEresult, OneTouch Ultra 2 and Embrace brands account for only about 16.94% of the volume of test strips on the market.[9]

192.     At the time they submitted their mail order diabetic supplies bid to the CMS, defendants were required to and did agree to service at least 50% of the brands on the market, by volume.

193.     As a resource for beneficiaries, Medicare posts the contact information for mail order diabetic testing suppliers, and lists the brands that those suppliers have agreed to provide.

194.     A beneficiary looking at this website would believe that defendants service a much broader range of supplies than defendants actually service.

---

[9]     Medicare maintains a website where mail order supply bidders can list the brands they proposed to service, and Medicare calculates the percent of the diabetic testing strip market each brand occupies.  According to this website, OneTouch Ultra 2 accounts for 0.51% of the market.  Embrace accounts for 4.1% of the market.  Prodigy AutoCode accounts for 2.33% of the market.  And TRUEresult – which is not available from the dropdown menu and must be entered manually – is counted as 10.0%.  *See* https://www.dmecompetitivebid.com/secure/cbicsecure.nsf/NMO50Comply (last visited July 17, 2013).

195.     When beneficiaries call defendants, asking for testing supplies defendants have represented to Medicare that they service, but that they do not actually service, defendants will, based on the call scripts described above, attempt to flip these beneficiaries into one of defendants' two preferred brands of testing supplies.

196.     Accordingly, even after the beginning of the defendants' competitively bid contract on July 1, 2013, defendants have knowingly induced Medicare beneficiaries to change from their existing brands to one of the two Arriva preferred brands, in clear violation of federal law.

197.     Defendants never had any intention of supplying testing strips for 50%, by volume, of the brands on the market. Instead, defendants used their position as a contract bid winner to induce thousands of beneficiaries to switch over into defendants' preferred brands of diabetic testing supplies, in order to advance defendants' own financial interests.

## VII.     SPECIFIC EXAMPLES OF FRAUDULENT BILLING

198.     On April 9, 2013, Relator spoke to beneficiary Patient A, FLASH patient ID No. 11022082. Pursuant to defendants' express instructions, Relator switched her over into one of the two preferred brands, in this case the Prodigy AutoCode. The date of service for this meter was recorded in the system as April 9, 2013, and the charge for the meter (which was shown with the CPT code MTPROD) was shown as $0.00. Accordingly, neither Medicare nor the patient was billed at all for this product, making it an unlawful kickback to the beneficiary. In contrast, the strips for that meter (shown with a CPT code STPROD) were billed, at a cost of $68.38.

199.     For the small number of patients to whom defendants have been willing to sell the OneTouch brand meters and testing strips, defendants have specifically instructed sales representatives to send those patients new OneTouch meters and to bill those meters to Medicare. Specifically, Relator is aware of eight patients who already had OneTouch meters. At defendants'

express instruction, Relator had additional OneTouch meters shipped to these patients and billed Medicare for the cost. These eight patients have the following FLASH patient ID numbers:

(a)     21398847
(b)     20018896
(c)     20025707
(d)     21249672
(e)     21447738
(f)     21353655
(g)     20165474
(h)     21412496

200.     Relator is also aware of fraudulent billing related to Patient B, who had the FLASH patient ID No. 21393301. Relator spoke to this patient in late June 2013 and learned that the patient had a OneTouch meter and was adamant that he did not want a new one. Relator made a note of this fact and specifically noted that Arriva should not send the patient a new meter. However, when Relator checked the file for this patient several days later, he saw that defendants had scheduled a new meter for shipment and billed Medicare for it.

201.     On June 26, 2013, Relator placed a reorder for Patient C, a Medicare beneficiary with FLASH patient ID No. 20533560. In the notes for Patient C, Relator specifically indicated that the patient already had a OneTouch Ultra meter and did not want a new one. However, despite these notes, defendants shipped a new meter and billed for it. In Relator's experience, this was a common practice for defendants.

202.     Relator is also aware of several examples of defendants placing an order for a new patient and billing Medicare for the diabetic testing supplies without having a new order on file, including:

(a)     Defendants billed Medicare for diabetic supplies for Patient D, a beneficiary with Arriva patient ID No. 11494163, without having any physician's order on file.

(b)     Defendants billed Medicare for diabetic supplies for Patient E, a beneficiary with Arriva patient ID No. 11488469 for an order with a date of service of May 24, 2012. Not only

did Arriva not have a current doctor's order on file at the time of billing, but Patient's E's physician responded to an Arriva fax blast, specifically refusing to submit a new order.

(c)     Defendants billed Medicare for diabetic supplies for Patient F, a beneficiary with Arriva patient ID No. 11492119, without a new order on file. As with Patient E, Patient F's physician had specifically responded to Arriva's fax blast by refusing to provide a new prescription.

(d)     Defendants billed Medicare for diabetic testing supplies for Patient G, a beneficiary with Arriva patient ID No. 11588391, without a new order on file. As with Patients E and F, Patient G's physician had specifically responded to Arriva's fax blast by refusing to provide a new prescription.

(e)     Defendants billed Medicare for diabetic testing supplies for Patient H, a beneficiary with Arriva patient ID No. 11515526, without a new order on file. As with Patients E, F, and G, Patient H's physician had specifically responded to Arriva's fax blast by refusing to provide a new prescription.

203.     Relator is also aware of fraudulent billing for products that Arriva illegally marketed to Medicare beneficiaries. Defendants billed Medicare for a heating pad for Patient I, a beneficiary with Arriva patient ID No. 12195665. Defendants convinced Patient I to place an order for a heating pad during defendants' first phone conversation with that patient, in violation of federal regulations prohibiting such unsolicited marketing.

## VIII.   CAUSES OF ACTION

### COUNT I

**Defendants' False Claims for Medically Unnecessary Glucose
Monitors and Testing Strips Was in Violation of the FCA,
31 U.S.C. § 3729(a)(1)(A)-(B)**

204.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

205. At all times relevant to this Complaint, Arriva and Alere knowingly presented, or caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States. These false claims included claims for glucose monitors, which defendants presented to the United States for payment, knowing the glucose monitors to be medically unnecessary, due to the fact that beneficiaries already possessed glucose monitors that were less than five years old.

206. Defendants also submitted false claims for payment for medically unnecessary testing strips. Specifically, in June 2013, defendants began filling orders for testing strips for beneficiaries who had more than a 30-day supply on hand, in violation of applicable coverage determinations.

207. By virtue of the false and fraudulent claims that defendants presented, the United States has suffered actual damages.

208. Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by defendants.

## COUNT II

### Defendants' False Claims for Unreasonable Diabetic Testing Supplies Was in Violation of the FCA, 31 U.S.C. § 3729(a)(1)(A)-(B)

209. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

210. At all times relevant to this Complaint, Arriva and Alere knowingly presented, or caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States.

211. Specifically, defendants submitted claims for payment for diabetic testing supplies—including glucose meters, testing strips, lancets and lancet devices—without having the necessary physician orders on file.

212.     The MEDICARE PROGRAM INTEGRITY MANUAL requires suppliers of diabetes testing supplies to obtain a detailed written order from a physician prior to billing Medicare.  CMS, MEDICARE PROGRAM INTEGRITY MANUAL, ch. 5.2.3, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS019033.html.

213.     Any time a beneficiary switches from one supplier to another, the new supplier is required to obtain a new physician order prior to billing Medicare for any additional supplies for that beneficiary.  *Id.*, ch. 5.2.4.

214.     If a supplier does not have an order "that has been both signed and dated by the treating physician before billing the Medicare program, the item will be denied as not reasonable and necessary."  *Id.*, ch. 5.2.3.

215.     By virtue of the false and fraudulent claims that defendants presented, the United States has suffered actual damages.

216.     Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by defendants.

## COUNT III

**Defendants' Kickbacks to Beneficiaries in the Form of Free Meters
and Forgiving Copayments Violated the FCA,
31 U.S.C. § 3729(a)(1)(A)-(B)**

217.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

218.     Federal law recognizes that any claim for payment on the federal government arising from an unlawful kickback is a false and fraudulent claim.  42 U.S.C. § 1320a-7b(g).

219.     At all times relevant to this Complaint, defendants pursued a general scheme to induce beneficiaries to order particular brands of diabetic testing supplies from Arriva by offering

those beneficiaries "free upgrades" to their glucose meters, and by refusing to make reasonable efforts to collect beneficiary copayments.

220.    Defendants specifically instructed their sales representatives to tell beneficiaries that new meters came with a "no cost guarantee."

221.    For thousands of these beneficiaries, defendants never billed Medicare for the new meters and, accordingly, never attempted to collect the copayment from the beneficiaries.

222.    Through these glucose monitor upgrades, defendants offered in-kind payments—*i.e.*, kickbacks—to beneficiaries to induce those beneficiaries to purchase their diabetic testing supplies from Arriva.

223.    Additionally, defendants did not maintain any collections department to pursue the copayments that beneficiaries were supposed to pay for their diabetic testing supplies.

224.    Because they did not maintain a collections department, defendants regularly forgave beneficiary copayments without making any reasonable efforts to collect on them.

225.    At all times relevant to this Complaint, defendants presented claims for payment to the United States for diabetic testing supplies that defendants knew were fraudulently induced by unlawful kickbacks.

226.    By virtue of the false or fraudulent claims that defendants presented, the United States has suffered actual damages.

227.    Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by defendants.

# COUNT IV

**Defendants' False Claims for Glucose Monitors and Testing Strips Arising from
Unlawful Advertising and Inducements to Beneficiaries Violates the FCA,
31 U.S.C. § 3729(a)(1)(A)-(B)**

228.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

229.    Under federal law, Medicare contract suppliers of mail order diabetic testing supplies have been forbidden, since July 1, 2013, from "influencing or incentivizing the beneficiary by persuading, pressuring, or advising them to switch from their current brand or for new beneficiaries from their preferred brand of glucose monitor and testing supplies." 42 C.F.R. § 414.422(e)(3). This is commonly known as the "anti-switching" or "anti-flipping" rule.

230.    Contract suppliers, such as defendants, are only permitted to furnish information about alternative brands if the beneficiary affirmatively requests such information. 42 C.F.R. § 414.422(e)(3).

231.    Contract suppliers are also obligated to furnish a "sufficient number of different types of diabetic testing strip products that, in the aggregate . . . includes at least 50 percent of all the different types of products on the market." 42 C.F.R. § 414.411(a). This is generally known as the "50 percent" rule.

232.    In violation of these requirements, defendants have knowingly and systemically influenced and incentivized beneficiaries to switch to one of defendants' two preferred brands of diabetic testing supplies since July 1, 2013. Such violations include, *inter alia*: telling beneficiaries, without being asked, that defendants' preferred brands are "pain-free" and "easy-to use"; offering free "upgraded" meters; and falsely representing that defendants carry a wider range of products than they actually carry, in order to induce a wider range of beneficiaries to call in, at which point defendants attempt to flip those beneficiaries to a preferred brand of supplies.

233.   Such violations have led defendants to file false and fraudulent claims for payment to the United States.  Specifically, defendants have sought payment for diabetic supply orders that defendants would not have obtained if not for their clear violations of Medicare's "anti-switching" and "50 percent" rules.

234.   By virtue of the false or fraudulent claims that defendants presented, the United States has suffered actual damages.

235.   Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by defendants.

## COUNT V

**Defendants' Scheme to Market Unsolicited Heating Pads,
Back Braces and Impotence Therapy Devices Violated the FCA,
31 U.S.C. § 3729(a)(1)(A)-(B)**

236.   Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

237.   Under federal law, suppliers of durable medical equipment, such as defendants, are generally prohibited from contacting individuals covered by Medicare regarding the furnishing of a covered item to that individual.  42 U.S.C. § 1395m(a)(17)(A).

238.   Suppliers are permitted under this law to contact individuals covered by Medicare who specifically consent in writing to have the supplier call that beneficiary regarding the furnishing of a covered item.  42 U.S.C. § 1395m(a)(17)(A)(i).  However, during such a telephone call, the supplier is not permitted to discuss the furnishing of any item other than the item the beneficiary agreed to discuss.

239.   At all times relevant to this Complaint, Arriva and Alere knowingly marketed heating pads, back braces, and impotence therapy devices to new customers who never consented to have defendants contact them regarding the furnishing of such items.

240. Under the law, "[i]f a supplier knowingly contacts an individual in violation of subparagraph (A), no payment may be made under this part for any item subsequently furnished to the individual by the supplier." 42 U.S.C. § 1395m(a)(17)(B).

241. In violation of these requirements, defendants have knowingly and routinely submitted claims for payment to the United States for products furnished to beneficiaries after unlawful telephone solicitations.

242. By virtue of the false or fraudulent claims that defendants presented, the United States has suffered actual damages.

243. Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by defendants.

## COUNT VI

**Defendants' Scheme to Give Kickbacks to United Healthcare and Express
Scripts in Exchange for Referring Patients to Defendants Violated the FCA,
31 U.S.C. § 3729(a)(1)(A)-(B)**

244. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

245. Federal law recognizes that any claim for payment on the federal government arising from an unlawful kickback is a false and fraudulent claim. 42 U.S.C. § 1320a-7b(g).

246. At all times relevant to this Complaint, defendants pursued a general scheme to financially reward secondary insurance providers United and ESI for referring beneficiaries to defendants for their diabetic testing supplies.

247. In exchange for United and ESI making Arriva their preferred provider of diabetic testing supplies, defendants agreed to bill United and ESI less than the true value of the 20% copayment required under Medicare.

248. Moreover, defendants agreed that for beneficiaries covered by United and ESI, defendants would not seek to collect any of the 20% copayment from the individual beneficiary.

249. Accordingly, under this kickback scheme, defendants subsidized a portion of the 20% copayment for diabetic testing supplies.

250. At all times relevant to this Complaint, defendants presented claims for payment to the United States for diabetic testing supplies that defendants knew were fraudulently induced by unlawful kickbacks.

251. By virtue of the false or fraudulent claims that defendants presented, the United States has suffered actual damages.

252. Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by defendants.

## COUNT VII

### Unjust Enrichment Under the Common Law of Tennessee

253. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

254. Under Tennessee law, a defendant is liable for unjust enrichment when a plaintiff confers a benefit upon the defendant; the defendant appreciates such benefit; and acceptance of such benefit under the circumstances renders it inequitable for the defendant to retain the benefit without paying for it.

255. Here, plaintiff, the United States, conferred a benefit on defendants by paying fraudulent claims submitted for payment by defendants.

256. Defendants knew that the claims they submitted for payment were false and fraudulent and appreciated the benefit that plaintiff conferred on them.

257.    Accordingly, defendants are and have been unjustly enriched by the United States' payment of defendants' false and fraudulent claims.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States, demands that judgment be entered in his favor and against defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This includes, with respect to the FCA, three times the amount of damages to the federal government plus civil penalties of no more than $11,000 and no less than $5,500 for each false claim, and any other recoveries or relief provided for under the FCA.

Further, Relator requests that he receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs.  Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## JURY DEMAND

Relator demands a trial by jury.

DATED: August 1, 2013

Respectfully submitted,

DAVID W. GARRISON (BPR # 24968)
SETH M. HYATT (BPR # 31171)
SCOTT P. TIFT (BPR # 27592)
217 Second Avenue, North
Nashville, TN 37201-1601
Telephone: 615/244-2202
615/252-3798 (fax)
dgarrison@barrettjohnston.com
shyatt@barrettjohnston.com
stift@barrettjohnston.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
ROBERT K. LU
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
rlu@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
JANINE D. ARNO
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
jarno@rgrdlaw.com

*Attorneys for Plaintiff*