UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATE OF AMERICA ex rel. ) <br> GREGORY M. GOODMAN, ) <br> ) <br> **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> ARRIVA MEDICAL, LLC, ALERE, INC., ) <br> TED ALBIN, and GRAPEVINE BILLING ) <br> AND CONSULTING SERVICES, INC., ) <br> ) <br> **Defendants.** ) <br> ) | Case No. 3:13-cv-0760 <br> Judge Aleta A. Trauger |

# MEMORANDUM

Ted Albin and Grapevine Professional Services, Inc. d/b/a Grapevine Billing and Consulting Services[1] ("Grapevine") have filed a Motion to Dismiss (Docket No. 128), to which the United States has filed a Response (Docket No. 134), and Albin and Grapevine have filed a Reply (Docket No. 137). For the reasons set out herein, the motion will be denied.

## I. BACKGROUND

In 1863, "as a result of investigations of the fraudulent use of government funds during the Civil War," Congress enacted the original version of the False Claims Act, now typically referred to as the "FCA." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). Although "[d]ebates at the time suggest that the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government," *id.*, the Act "was originally aimed principally at stopping the massive frauds perpetrated by large contractors" related to the war effort. *United*

---

[1] Grapevine contends that the corporate name attributed to it by the Government in the case caption, "Grapevine Billing and Consulting Services, Inc.," is incorrect. (Docket No. 129 at 3 n.1.)

*States v. Bornstein*, 423 U.S. 303, 309 (1976). The Act, in amended form, has endured for over a century and a half, in which it has witnessed generations of change in the types of fraud committed and the types of government funds vulnerable to fraud. Today, the False Claims Act is often, although far from exclusively, invoked in the context of the large public expenditures related to the nation's various federal (or joint federal/state) healthcare programs—most prominently, Medicare, Medicaid, and TRICARE.

"Since its enactment . . . , the False Claims Act has authorized both the Attorney General and private *qui tam* relators to recover from persons who make false or fraudulent claims for payment to the United States." *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 283 (2010). The *qui tam* provision creates an incentive for private individuals who become aware of fraud on the government to bring that fraud to light, in exchange for a share of the recovery—which, pursuant to 31 U.S.C. § 3729(a)(1), can include both treble damages and penalties. *See State Farm Fire & Cas. Co. v. U.S ex rel. Rigsby*, 137 S. Ct. 436, 440 (2016) (observing that "[t]his system is designed to benefit both the relator and the Government."). On August 1, 2013, one such *qui tam* relator, Gregory M. Goodman, filed an FCA Complaint against his employer, Arriva Medical, LLC, and the company that acquired it, Alere, Inc. (Docket No. 1 ¶¶ 4, 10.) He accused the companies of "six distinct but related schemes to defraud the federal government." (*Id.* ¶ 11.)

Among Goodman's allegations was that the defendants, who provide diabetes supplies such as glucose meters and test strips, improperly waived or forgave Medicare Part B patients' copayment and deductible obligations, which the Complaint characterized as a form of kickback that would give rise to FCA liability. (*Id.* ¶¶ 7, 13, 41.) As the Department of Health and Human Services Office of the Inspector General ("HHS-OIG") has explained,

> 42.U.S.C. § 1320a-7a(a)(5) prohibits a person from offering or transferring remuneration to a beneficiary that such person knows or should know is likely to influence the beneficiary to order items or services from a particular provider or supplier for which payment may be made under a Federal health care program. "Remuneration" is defined as including a waiver of coinsurance and deductible amounts, with exceptions for certain financial hardship waivers, which are not prohibited.

(*Id.* ¶ 41 (quoting HHS-OIG, *Blood Glucose Test Strips: Marketing to Medicare Beneficiaries*, OEI-03-98-00231 (June 2000)).) Accordingly, influencing a patient's choice of diabetes supply vendors by waiving his copays is, the argument goes, an unlawful kickback. (*Id.*) Pursuant to the Anti-Kickback Statute ("AKS"), a claim for payment under a federal healthcare program "that includes items or services resulting from a violation of the" AKS's anti-kickback provisions "constitutes a false or fraudulent claim for purposes of" the FCA. 42 U.S.C. § 1320a-7b(g).

The Complaint pleaded six counts under the FCA, with each count representing a different theory of liability encompassing numerous Medicare claims over time. (*Id.* ¶¶ 204–52.) It also pleaded claims for unjust enrichment under Tennessee common law. (*Id.* ¶¶ 253–57.) In addition to the copayment/deductible waiver and forgiveness allegations, Goodman alleged that Arriva/Alere routinely billed for glucose meters that it knew were likely to be disallowed under Medicare because the program had already paid for a glucose meter for that patient in the last five years. The company would then write off most or all of the patient's liability for the glucose meter when Medicare denied payment, resulting in another form of kickback with regard to the patient's continued use of Arriva/Alere for other supplies. (*Id.* ¶¶ 68, 121.)

A *qui tam* complaint under the FCA "shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders." 31 U.S.C. § 3730(b)(2). "The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal . . . ." 31 U.S.C. § 3730(b)(3). Eventually,

3

however, the Government faces a choice: it must either inform the court that it wishes to "proceed with the action, in which case" the Government will take over the litigation; or it must "notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action." 31 U.S.C. § 3730(b)(4)(A)–(B). In the years following Goodman's filing of his Complaint, the Government received a number of extensions of the seal and the window for intervention, in order to allow it to pursue its investigation of the defendants. (*See, e.g.*, Docket Nos. 21, 29, 36, 40, 44, 48, 52, 66.)

For the first few years of the Government's investigation, it apparently had no knowledge of any connection between the activities it was investigating and Albin or Grapevine, who had not yet been named as defendants. In February of 2017, however, emails to and from Albin "were produced by Arriva and Alere to the government" as part of its investigation. (Docket No. 121 ¶¶ 351–53.) The Government issued a civil investigative demand, or "CID,"[2] to Albin, pursuant to which he provided testimony on April 30, 2018. (*Id.* ¶ 354.) During the testimony, Albin admitted that, while he had been a consultant for Arriva, he, among other things, created a policy of not sending a bill to customers who owed less than $5, developed a policy of giving customers "courtesy adjustments" to their amounts owed, and personally directed employees to "write off" customer debt. (*Id.* ¶ 355.) He also explained in his testimony that he had performed his consulting work for Arriva through his company, Grapevine. (*Id.* ¶ 356.)

On May 14, 2019, the Government filed a Complaint-in-Intervention, in which it named as defendants, not only Arriva and Alere, but also Albin, as an individual. (Docket No. 76.) On August 1, 2019, the Government filed an Amended Complaint-in-Intervention adding Grapevine

---

[2] The FCA allows the Government to issue civil investigative demands, or "CIDs," for documents, testimony, or answers to interrogatories if it "has reason to believe that any person may be in possession, custody, or control of any documentary material or information relevant to a false claims law investigation." 31 U.S.C.A. § 3733(a)(1).

as well. (Docket No. 121.) According to the Amended Complaint-in-Intervention, "Albin, through . . . Grapevine, has been a reimbursement consultant to Arriva and Alere, and, for a period, oversaw and directed Arriva's submission of claims to Medicare." (*Id.* ¶ 1.) According to the Government, [t]hrough his position as a consultant to Arriva and Alere, Albin, among other things, directly and indirectly communicated with and provided direction to Arriva employees who worked at Arriva's Antioch call center about whether they could agree to provide beneficiaries free glucometers or waive copayment obligations." (*Id.* ¶ 38.) The Government provided examples of Albin directing, overseeing, or being otherwise involved in or aware of the policy of writing off or declining to collect on patient liabilities. (*Id.* ¶¶ 169, 174, 186, 209, 219.)

The Amended Complaint-in-Intervention is not entirely clear with regard to the breakdown of Albin's duties over time. It alleges, generally:

> From 2009 until December 2017, Albin was a consultant for Arriva and Alere. For years, Albin oversaw Arriva's efforts to seek reimbursement from Medicare for diabetic testing supplies sold to beneficiaries of Medicare, including submitting claims to Medicare on Arriva's behalf. Albin also oversaw Arriva's process for writing off the cost of "free" or "no cost" glucometers and copayment waivers.

(*Id.* ¶ 33.) Albin and Grapevine argue, however, that the Amended Complaint-in-Intervention does not allege any specific reimbursement-related responsibilities for Albin after the Fall of 2011, when Arriva was sold to Alere. (*See id.* ¶¶ 1, 30.) The Complaint quotes an internal email from Albin in November 2011, explaining that the company's "collection efforts on patient balances are very soft," and it "would never put time and effort into an aggressive collection." (*Id.* ¶ 209.) The Complaint also cites an email from Albin in October 2012 related to Medicare billing, which included statistics confirming Arriva/Alere's very low collection rate from Medicare patients, as well as an October 2012 presentation that Albin attended in which the company's recoupment policies, including writeoffs, were discussed. (*Id.* ¶¶ 222–24, 279–82.) After those particular dates,

5

there are not specific allegations of Albin's involvement in the scheme, other than that he continued to work with the company as a consultant and had been an architect of the underlying practices, which continued for several more years, until at least November 2016 and possibly thereafter. (*Id.* ¶ 2.)

Count I of the Amended Complaint-in-Intervention is an FCA claim based on the submission of false claims to Medicare, pursuant to 31 U.S.C. § 3729(a)(1)(A). Count II is a claim based on the making or using of false records material to a false or fraudulent Medicare claim, pursuant to 31 U.S.C. § 3729(a)(1)(B). Count III is for conspiracy under the FCA, pursuant to 31 U.S.C. § 3729(a)(1)(C). Counts IV and V are, respectively, for unjust enrichment and payment by mistake. (Docket No. 121 ¶¶ 391–419). Albin and Grapevine have now asked the court to dismiss the claims against them on the basis that they are untimely. In the alternative, they argue that the Government has failed to plead causes of action against them with sufficient particularity. (Docket No. 128.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can

ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

Rule 9(b) of the Federal Rules of Civil Procedure states that, when pleading fraud, "a party must state with particularity the circumstances constituting fraud." The Sixth Circuit has explained that, while Rule 9(b) imposes a heightened standard, the underlying purpose of the rule is to serve the same ends as the general pleading requirements of Rule 8:

> [Rule 9(b)] should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citations and quotation marks omitted). "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.* "Where a complaint alleges 'a complex and far-reaching fraudulent

7

scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar v. BWXT Y–12, LLC*, 525 F.3d 439, 444–45 (6th Cir. 2008) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007)).

### III. ANALYSIS

#### A. Statute of Limitations for FCA Claims

As many courts have observed, the general rule is that "[s]tatute-of-limitations defenses are [more] properly raised in Rule 56 motions [for summary judgment], rather than Rule 12(b)(6) . . . motions, because '[a] plaintiff generally need not plead the lack of affirmative defenses to state a valid claim.'" *Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*, 359 F. Supp. 3d 546, 567 (E.D. Tenn. 2019) (quoting *Paulin v. Kroger Ltd. P'ship I*, No. 3:14-cv-669, 2015 WL 1298583, at *4 (W.D. Ky. Mar. 23, 2015)). However, if it is "'apparent from the face of the complaint that the time limit for bringing the claim[s] has passed,'" then the plaintiff, if it wishes to avoid dismissal, has an "obligation to plead facts in avoidance of the statute of limitations defense." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)). When "the allegations in the complaint affirmatively show that a claim is time-barred," then "dismissing the claim under Rule 12(b)(6) is appropriate." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012)

"The False Claims Act contains two limitations periods that apply to . . . an action asserting that a person presented false claims to the United States Government. The first period"—found in 31 U.S.C. § 3731(b)(1)—"requires that the action be brought within 6 years after the statutory violation occurred. The second period"—found in 31 U.S.C. § 3731(b)(2)—"requires that the action be brought within 3 years after the United States official charged with the responsibility to

8

act knew or should have known the relevant facts, but not more than 10 years after the violation."[3] *Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S. Ct. 1507, 1510 (2019). If the two methods of calculation yield different dates, "[w]hichever period provides the later date serves as the limitations period." *Id.*

Albin and Grapevine argue that neither statute of limitations permits the claims against them. They argue first that there are no allegations against them, pleaded with particularity, after 2011 or, at the latest, 2012. Accordingly, they argue, the base six-year statute of limitations had already elapsed by the time the Government filed its Complaint-in-Intervention. Albin and Grapevine argue next that the Government cannot rely on the extended statute of limitations based on the date from which "the United States official charged with the responsibility to act knew or should have known the relevant facts," because, by the Government's own account, it had ostensibly been investigating Arriva and Alere for years before supposedly discovering Albin's role in the companies' inner workings. Albin and Grapevine argue that, at least without facts pleaded explaining why it took so long to learn of Albin and Grapevie, it is simply implausible that that represented a reasonable delay, given the supposed centrality Albin allegedly had in the underlying fraudulent scheme. They point out that the Government does not allege particular facts regarding its due diligence, or lack thereof, in performing its investigation, which Albin and Grapevine suggest renders the Government unable to rely on the discovery-based window for filing its claims.

The Government responds to the arguments by Albin and Grapevine in two ways. First, the Government disputes that the cutoff date for claims against Albin for purposes of the six-year

---

[3] Although the Supreme Court has never definitively resolved the issue, "the United States official charged with the responsibility to act" is typically construed to refer to "the Attorney General (or his delegate)." *Hunt*, 139 S. Ct. at 1514.

statute of limitations was in 2011 or 2012. The Government argues that it has pleaded that Albin was the architect of Arriva's scheme and that he continued working with Arriva as a consultant until December of 2017, during which time Arriva/Alere continued executing his scheme and submitting kickback-tainted false Medicare claims. The specific communications that the Government cites, it argues, are merely supportive details establishing Albin's role in the scheme, not outer temporal bounds of his involvement. Next, the Government argues that, even with regard to kickback-tainted Medicare claims filed more than six years before its inclusion of Albin and Grapevine in the case, it is entitled to the FCA's extended statute of limitations because it could not reasonably have known about Albin's or Grapevine's involvement earlier than it did.

Neither issue can be resolved on a motion to dismiss. With regard to the date range for which Albin can be held responsible for Arriva/Alere's actions, it may well be that there is some point after which his lack of continued involvement in recoupment practices would cause his potential FCA liability to cease. However, the FCA reaches not only the entity or person who submits a false claim, but one who "causes" a false or fraudulent claim "to be presented" or "causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B). Nothing in the plain language of the statute precludes the possibility that an individual's actions on one date might "cause" a false claim on a later date.

Delineating when the FCA's provisions regarding claims "caused" by a defendant translate to individual liability on behalf of an executive or consultant can be a complex and difficult task. *See, e.g.*, *United States v. Bourseau*, 531 F.3d 1159, 1169 (9th Cir. 2008) (upholding finding of FCA liability against company's president because of his role in the underlying scheme). From the face of the Complaint, it is plausible that Albin's culpability extended to within the six-year base limitations period under the FCA. Moreover, the Government is correct that the date-specific

10

details that it has included regarding Albin are precisely the type of corroborative and explanatory facts that Rule 9(b) encourages (and arguably requires), and the Amended Complaint-in-Intervention does not present those facts as establishing the only dates of Albin's involvement. Rather, the Complaint-in-Intervention describes a long-running scheme of which Albin was a principal architect, regardless of whether he may have had shifting job duties. A more detailed parsing of his culpability over time would be more appropriate on a motion for summary judgment.

Similarly, while Albin and Grapevine raise legitimate concerns about the length of the Government's investigation and how long it took the Government to uncover Albin's involvement, the court cannot jump to the conclusion that the amount of time it took to become aware of Albin and Grapevine was unreasonable. The Government's investigation was undoubtedly complex, and, without a more detailed understanding of the investigation's course, as well as any potentially more expeditious alternatives, the court cannot reach a conclusion regarding how long it would have taken a reasonable government actor to know to file claims against Albin and Grapevine. Moreover, although the Government had an obligation to plead fraud with particularity and to plead claims that were not facially untimely, it was not required to plead every detail necessary to allow the court to adjudicate a statute of limitations affirmative defense. The Amended Complaint-in-Intervention establishes that the timeliness issue is a plausibly contestable issue of fact, which is enough to defeat a Motion to Dismiss.

## B. Pleading Fraud with Particularity

Albin and Goodman argue next that the Government has failed to allege, with sufficient particularity, that they violated the FCA. Specifically, they argue that the Government has failed to tie them to any particular false claims but, at most, a broadly objectionable policy that led to the filing of allegedly false claims by the other defendants in this case. When pursuing claims against

multiple defendants, "a fraud claim requires specific allegations as to each defendant's alleged involvement . . . ." *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 773 (M.D. Tenn. 2013) (Haynes, C.J.). Mere "'group pleading' . . . fails to meet . . . [Rule] 9(b)'s specificity requirements . . . ." *D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 730 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005). Albin and Arriva argue that the Government has merely used a few allegations about internal corporate decision-making to dress up what is, otherwise, a complaint impermissibly group pleading liability under the Act.

As Albin and Grapevine point out, the FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877–78 (6th Cir. 2006) (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)). Accordingly, even if an unlawful activity has taken place, the FCA will not provide the appropriate enforcement mechanism unless the defendant has been sufficiently tied to a claim for payment under a government program or contract. As the court has already discussed however, the FCA provides multiple avenues through which the connection between the defendant and the claim can be made, including by showing that the defendant caused another party to submit a false claim.

The Amended Complaint-in-Intervention alleges that Albin was central in formulating and adopting Arriva's recoupment and billing policies with regard to Medicare patients, and those policies are the core of the kickback allegations on which the Government's allegations are alleged. The policies at issue, moreover, are not merely some attenuated form of illegality that the Government is trying to shoehorn into allegations about claims submission. Recoupment of patient liabilities is central to the claims and billing process. The Government's allegation that Albin

designed and put those policies in place is also inherently an allegation that he caused claims to be submitted that violated the AKS.

Generally speaking, a plaintiff seeking to comply with Rule 9(b) must "allege the time, place, and content of the alleged misrepresentation" at issue. *Bledsoe*, 501 F.3d at 504 (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)). When the plaintiff alleges a wide-ranging scheme involving numerous systematic misrepresentations, however—for example, where the Government alleges that a healthcare provider was submitting or causing to be submitted thousands of claims that were all false for the same reason—then that requirement is relaxed to require the plaintiff to plead "representative" examples, not every single false claim at issue. *Marlar*, 525 F.3d at 445 (quoting *Bledsoe*, 501 F.3d at 510). The Government met this requirement, including with regard to Albin and Grapevine, by providing examples of particular claims tainted by the kickback scheme that Arriva/Alere engaged in but Albin and Grapevine worked to put in place. (Docket Nos. 121 ¶ 335 & 121-1.) The prohibition on group pleading under Rule 9(b) prevents a plaintiff from simply lumping multiple defendants together without explaining each defendant's culpable role. Once the defendants' respective actions are set forth, however, there is nothing inherently wrong with using the same set of examples to support the allegations against each defendant. The Government's allegations, therefore, are sufficient to defeat a motion to dismiss.

The defendants' argument that the Government has failed to adequately allege a conspiracy fails for similar reasons. "Section 3719(a)(1)(C), prohibiting FCA conspiracies, requires a relator to plead facts showing that there was a plan or agreement 'to commit a violation of' one or more of the FCA subsections." *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 917 (6th Cir. 2017) (quoting 31 U.S.C. § 3729(a)(1)(C)). Albin and Grapevine again argue that

there is a distinction between the underlying kickback scheme and the related false claims. At least in this case, however, the issues are inextricable. The nature of a copay waiver/patient forgiveness kickback scheme is as follows: (1) a service is performed or a drug or piece of equipment is provided; (2) Medicare is billed and pays for the portion of the payment for which it is liable, which excludes, for example, a patient copay or a disallowed service; but (3) the biller never collects the patient copay or other patient liability, because the marketing advantage of the free product is worth more than the comparatively small amount it would obtain from patients. Without the kickback-tainted Medicare claim, failing to collect from patients would be merely *giving things away for free*, and the entity's scheme would merely be a way to speedily bankrupt itself. The false claims, therefore, are an inherent and indispensable part of the scheme.

Albin and Grapevine also fault the Government for failing to use particular magic language regarding, for example, "a specific statement where [the defendants] agreed to defraud the government." *U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 27 (2d Cir. 2016). What matters, though, is not the specific language used, but the acts, communications, relationships, and agreements described. The Amended Complaint-in-Intervention describes Albin and Grapevine, outside consultants, working with Arriva to formulate and implement a policy that involved improper kickbacks and associated false claims. Those allegations are not defective purely because they were not more specifically shaped to mirror the language of conspiracy caselaw. The defendants' alleged conspiracy was, therefore, a conspiracy to violate the FCA, and the conspiracy claims against Albin and Grapevine will not be dismissed.

## C. Unjust Enrichment

Albin and Grapevine allege that the unjust enrichment claims against them both are untimely and fail on the merits. Although the court would typically look first to whether a

plaintiff's claims were untimely, in order to avoid an unnecessary consideration of merits issues if they were not timely, the timeliness of the Government's claims in this case depends, at least in part, on defining what those claims are. The court, accordingly, will look first to the merits.

**1. Merits.** Typically, when this court considers an unjust enrichment claim based on events that took place in Tennessee, the court applies Tennessee law of unjust enrichment. *See Freeman Indus. v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005). The courts have recognized, however, that a federal 'common law' claim for unjust enrichment is available surrounding certain federal statutes or payment obligations, with the federal unjust enrichment cause of action providing a backstop for liability related to those obligations akin to the backstop that unjust enrichment and quasi-contract provide for state common law claims that are similar to, but technically fall outside the bounds of, contract law. *See, e.g.*, *Farm Bureau Gen. Ins. Co. of Mich. v. Blue Cross Blue Shield of Mich.*, 655 F. App'x 483, 488 (6th Cir. 2016) (discussing common law unjust enrichment in the context of ERISA).

In the context of false claims, a finding of unjust enrichment is supported where "(1) the Government had a reasonable expectation of payment; (2) [the defendant] should reasonably have expected to pay;" and "(3) society's reasonable expectations of person and property would be defeated by nonpayment." *U.S. ex rel. Wall v. Circle Const., LLC*, 700 F. Supp. 2d 926, 939 (M.D. Tenn. 2010) (Haynes, J.) (quoting *United States v. Rogan*, 459 F. Supp. 2d 692, 728 (N.D. Ill. 2006)), *aff'd in part, rev'd in part on other grounds sub nom. U.S. ex rel. Wall v. Circle C Const., L.L.C.*, 697 F.3d 345 (6th Cir. 2012). The "reasonable expectation" of payment, in this context, is the reasonable expectation that the recipient of fraudulently obtained federal funds should not be expected to retain them, but rather to repay them to the government. *Id.*; *see United States v. Khan*,

No. 03-CV-74300, 2009 WL 2461031, at *5 n.4 (E.D. Mich. Aug. 5, 2009) (discussing caselaw from other circuits regarding unjust enrichment under the Medicare program).

Albin and Grapevine allege that the Amended Complaint-in-Intervention does not plead a claim for unjust enrichment against them because it does not allege that they, as opposed to Arriva or Alere, actually received any payment from the Medicare program. The Government responds that Albin and Grapevine can be held liable for unjust enrichment because they "received part of the proceeds of Defendants' Medicare fraud in the form of the payment of consulting fees paid to them by Arriva." (Docket No. 134 at 18.) The Government argues that the law of unjust enrichment "allows the victim to follow the proceeds of the fraud, collecting them from the pocket in which they land." *United States v. Carell*, 681 F. Supp. 2d 874, 885 (M.D. Tenn. 2009) (Wiseman, S.J.).

The Government is correct that many courts, including those in Tennessee, have held that "the benefit received by a defendant need not be direct to establish an unjust enrichment claim." *Freeman Indus.* 172 S.W.3d at 525; *see also In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, No. 1:14-MD-2508, 2015 WL 5166014, at *36 (E.D. Tenn. June 24, 2015) (discussing "the number of courts that have permitted plaintiffs to bring unjust enrichment claims through an indirect benefit"). Because the federal law of unjust enrichment tends to generally mirror ordinary common law, the court concludes that such a principle is likely applicable in at least some federal unjust enrichment cases. That does not, however, mean that a plaintiff can rely on an unjust enrichment theory to reach every employee or contractor who happened to have been paid out of ill-gotten funds. For the Government to have a cause of action against a defendant, the defendant's retention of the funds must be inequitable, such that the government would have a reasonable expectation of repayment. For example, the Government would presumably have no reasonable expectation of repayment from the wages of innocent cleaning staff who happened to work in an

office where Medicare fraud was being committed. Here, however, it is alleged that Albin and Grapevine were knowing, paid participants in the alleged wrongful scheme, which could support a holding that their retention of some payments might be inequitable, assuming the payments could actually be traced to them.

In their Reply, Albin and Grapevine do not dispute the general caselaw that recovery for indirect unjust enrichment is at least sometimes possible. They argue, however, that the Amended Complaint-in-Intervention fails to allege that any of Arriva/Alere's allegedly ill-gotten gains actually ended up in Albin's or Grapevine's pockets. For example, in *United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 503 (D.S.C. 2016), which the Government cites, the defendant's payment was directly tied to the profits of the company that was paid by Medicare; accordingly, it was possible to draw a clear line between the Medicare payments at issue and the defendant's own enrichment. Here, no such direct connection is alleged. However, Albin and Grapevine have not identified any case stating that that level of formal connection is required for an indirect unjust enrichment claim to proceed, at least if a similarly concrete connection can be established based on the mutual understanding between the defendants.

Read in the light most favorable to the Government, Albin was paid as a consultant, for at least some of the time he worked with Arriva/Alere, specifically to increase its Medicare business through the kind of scheme at issue here. If the facts do ultimately show that Albin and Grapevine were, as a practical matter, paid specifically for their work in increasing Medicare payments through improper means, that may support a claim for unjust enrichment. The court, accordingly, will not prematurely dismiss those claims based on a failure to plead a claim for liability on the merits.

**2. Timeliness.** As with most timeliness inquiries, the court must start by determining the length of the statute of limitations at issue with regard to the Government's unjust enrichment claims. The Government cites an opinion from another judge of this district—which the Government refers to as "precedent from this District" (Docket No. 134 at 4)—for the proposition that "the six-year limitations period applies to claims for unjust enrichment and payment by mistake brought in the context of FCA claims for Medicare fraud or overpayment." *Carell*, 681 F. Supp. 2d at 885 (Wiseman, S.J.). Of course, as the Government is no doubt aware, "[t]he general rule is that a district judge's decision neither binds another district judge nor binds" even the same judge in a different case. *McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) (citing 18-134 Moore's Federal Prac.-Civ. § 134.02). The court, accordingly, must consider the appropriate statute of limitations itself.

Judge Wiseman, in that earlier case, was persuaded by the reasoning of the Seventh Circuit in *FDIC v. Bank One, Waukesha*, 881 F.2d 390, 393 (7th Cir. 1989). That court considered whether a claim for unjust enrichment under federal law should be governed by the six-year statute of limitations associated with contract-based claims found in 28 U.S.C. § 2415(a) or the three-year statute of limitations for torts found in 28 U.S.C. § 2415(b), concluding, based on a lengthy review of the historical record, that, because unjust enrichment has its basis in equitable concepts of quasi-contract, the longer statute of limitations for breaches of contract should apply. *Bank One, Waukesha*, 881 F.2d at 393. This court is, like Judge Wiseman, persuaded. Accordingly, the statute of limitations for the Government's unjust enrichment claims is six years. Excluded from that six years are any periods during which "facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances." 28 U.S.C.A. § 2416(c).

Many of the arguments between the parties regarding the timeliness of the unjust enrichment claims mirror the arguments regarding the Government's FCA claims. Albin and Grapevine allege that the Government should only be able to rely on dates for which it specifically alleged actions by Albin, while the Government responds that those were only supportive facts offered alongside its allegation that Albin bears shared responsibility for Arriva/Alere's long-running kickback scheme due to his role in designing and implementing that scheme. As with the FCA claims, the fact that this issue has come to the court on a Rule 12(b)(6) motion favors the Government. The Amended Complaint-in-Intervention alleges Albin's involvement throughout the relevant period, rendering the claims against him not facially untimely, and the court cannot rule out the possibility that the Government is entitled to tolling. Accordingly, the issue of the statute of limitations cannot be resolved on a motion to dismiss.

The court notes, however, that the Government should not assume that the date range of these defendants' liability for unjust enrichment will be the same as the date range for FCA claims. As with the FCA claims, the Government argues that Albin, as an architect of the kickback scheme, caused false claims to continue to be submitted even after his direct involvement, which the Government characterizes as a "continuing wrong" that would allow recovery for unjust enrichment purposes. (Docket No. 134 (quoting *Petruzzo v. HealthExtras, Inc.*, No. 5:12-CV-113-FL, 2014 WL 12546371, at *14 (E.D.N.C. Sept. 8, 2014)). An unjust enrichment claim, however, would require, not just a continuing wrong against the government, but also continuing enrichment by Albin and Grapevine. If, for example, a consultant helps a company to put a fraudulent scheme in place, receives his one-time payment, and enjoys the spoils of the fraud no further, then his enrichment will have ended when he got paid, even if the fraud continues for years to come. Accordingly, for the Government to establish timely claims of unjust enrichment, it must establish

not only that the Government was harmed during the relevant period, but that those harms were among those that actually enriched the defendants. Those issues, however, are ultimately better suited to a motion for summary judgment, and the Government's pleadings are facially sufficient for their claims to continue.

## IV. CONCLUSION

For the foregoing reasons, the Motion to Dismiss filed by Albin and Grapevine (Docket No. 128) will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge